## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**OSVALDO SUAREZ,**

     **Plaintiff,**

**v.**                                        **No.**

**THE GEO GROUP, INC. d/b/a LEA COUNTY
CORRECTIONAL FACILITY, WARDEN DWAYNE
SANTISTEVAN, in his individual capacity,
CENTURION CORRECTIONAL HEALTHCARE
OF NEW MEXICO, SHANE MARTINEZ, Ph.D.,
HEALTH SERVICES DIRECTOR, in his individual
capacity, DRS. DOES 1-3, in their individual capacity,
NURSES DOES 1-3, in their individual capacity,
CORRECTIONAL OFFICERS DOES 1-3, in their
individual capacity, BRITTNEY BUCKELEW,
CHIEF OF SECURITY FOR LEA COUNTY
DETENTION CENTER, in her individual capacity,**

     **Defendants.**

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

COMES NOW Plaintiff, by and through his attorney, Law Office of Frances Crockett,

LLC (Frances Carpenter), and brings this civil rights complaint under 42 U.S.C. § 1983, the

Eighth Amendment of the United States Constitution, and the New Mexico Tort Claims Act, for

the failure of the Defendants to properly accommodate individuals with chronic medical

conditions, failing to develop adequate policies and training for diagnosing and attending to

emergent medical conditions, failure to train, supervise, and terminate employees, failure to

properly staff, failure to maintain the premises and building as well as transport of inmates to get

medical care, and failing to follow policy and procedure, all of which resulted in damages to

Plaintiff as set forth herein.

## JURISDICTION, PARTIES, AND VENUE

1.      Jurisdiction and venue are proper as all of the parties reside in New Mexico and the acts complained of occurred exclusively within Lea County, New Mexico. This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1343.

2.      Plaintiff Osvaldo Suarez (hereinafter "Plaintiff") at all times material to this complaint was a resident of Lea County, New Mexico.

3.      Upon information and belief, Defendant The GEO Group, Inc. d/b/a Lea County Correctional Facility (hereinafter "Defendant GEO") is a foreign, for profit corporation specializing in correctional and detention management and registered to do business in New Mexico.   Defendant The GEO Group, Inc. can be served via its registered agent, Corporate Creations Network, Inc., 400 N. Pennsylvania Avenue, #600, Roswell, NM   88201.

4.      At all times material hereto, Defendant GEO acted through their owners, officers, directors, employees, agents or apparent agents, including but not limited to administrators, management, supervisors, technicians and other staff personnel and are responsible for their acts or omissions pursuant to the doctrines of *respondeat superior,* agency, or apparent agency.

5.      Upon information and belief GEO Group, Inc is responsible for the maintenance, operation, management, and control of Lea County Correctional Facility (LCCF).

6.      Defendant Dwayne Santistevan (hereinafter "Defendant Santistevan") is the Warden of Lea County Correctional Facility and a resident of Lea County, New Mexico.

7.      Defendant Centurion Correctional Healthcare of NM (hereinafter "Defendant Centurion") is a New Mexico corporation contracted with New Mexico Corrections Department ("NMCD") for the provision of healthcare at New Mexico prison facilities during the times material hereto.

2

8.      At all times material hereto, Defendant Centurion acted through their owners, officers, directors, employees, agents or apparent agents, including but not limited to administrators, management, supervisors, technicians and other staff personnel and are responsible for their acts or omissions pursuant to the doctrines of *respondeat superior,* agency, or apparent agency.

9.      Defendant Shane Martinez, Ph.D. (hereinafter "Defendant Martinez") is the Health Service Administrator for Lea County Correctional Facility and, upon information and belief, is an employee or contractor for Defendant Centurion and a resident of Lea County, New Mexico.

10.     Defendant Brittney Buckelew (hereinafter "Defendant Buckelew") is the Chief of Security for Lea County Correctional Facility and, upon information and belief, is a resident of Lea County, New Mexico.

11.     Immunity is waived pursuant to the New Mexico Tort Claims Act, §41-4-12, §41-4-9, §41-4-10, and §41-4-6.

## FACTS COMMON TO ALL COUNTS

12.     Plaintiff hereby incorporates by reference the allegations of the previous paragraphs as though fully set forth herein.

13.     On March 20, 2019, Osvaldo Suarez was sent from Dona Ana County to Central New Mexico Correctional Facility (CNMCF) and given an RDC Intake Screen.   That screen, as well as those which followed at CNMCF noted that Mr. Suarez was on medication, Keppra 1,000mg for his well-documented seizure disorder. Keppra was prescribed by his physician at Presbyterian Medical Services (PMS) with directions to take one (1) tablet every twelve (12) hours.

14.     On March 29, 2019, a Medical Chrono was completed noting that Mr. Suarez was to be assigned to a bottom bunk.

15.     In April of 2019, Mr. Suarez was transferred to Lea County Correctional Facility (LCCF).   A Provider's Order dated April 18, 2019, from LCCF similarly noted Mr. Suarez's Keppra dosage as 1,000mg.   The note further stated that the pharmacy sent the Keppra to CNMCF on April 15, 2019, and a new order was placed for LCCF on April 28, 2019.

16.     An undated provider's order from Lea County Correctional Facility notes the dosage as 500mg.   There is no indication as to who made this change.

17.     After not receiving his prescribed dosages of Keppra on the evening of April 26, and the morning of April 27, 2019, and after several requests, Mr. Suarez was told by a nurse that he had been taken off of his medication.

18.     Mr. Suarez was still given a top bunk despite his documented seizure disorder.

19.     At that time, Mr. Suarez alerted his cellmate as to what to do if he had a seizure.

20.     That night, he had a seizure resulting in a fall from the top bunk bed resulting in Mr. Suarez biting his tongue, receiving two (2) black eyes, a cut below his eye, and other injuries to his mouth and jaw.

21.     Mr. Suarez woke up from his seizure strapped to a bed in the medical unit on April 28, 2019.   He was not taken to a hospital in spite of his injuries and his request to have an X-ray performed.

22.     On or about May 10, 2019, Mr. Suarez finally saw a doctor and had X-rays of his face.

23.     Mr. Suarez made repeated requests to have his medications given to him in the proper dosages and at the proper times, including filing multiple grievances.

4

24.     In early June, Mr. Suarez was moved to another unit, and again assigned to a top bunk, in spite of the clear direction in his file that he was to be on a bottom bunk due to his seizure disorder.

25.     At that time, he again was not given his proper medication, and on June 5, 2019, he had another seizure, falling from the upper bunk.   Fortunately, his cellmate caught him before he suffered significant injuries, although he did injure his foot and bit a chunk out of his tongue.

26.     On June 6, 2019, this counsel wrote a letter to Warden Santistevan advising him of the situations with Mr. Suarez's medication and assignment to an upper bunk.   Also on that date, this counsel sent a Tort Claims Notice regarding the incidents.

27.     At that time, Mr. Suarez was still suffering the effects of his seizure on April 27, 2019, specifically his eye which was still black and exhibited blurry vision.   Several months later, Mr. Suarez saw an eye doctor who told him the black eye was probably the result of nerve damage and may be permanent.   Mr. Suarez was prescribed glasses which he had never needed before the seizure.

28.     After receiving no response, counsel again wrote to Warden Santistevan, on July 10, 2019, advising that Mr. Suarez was not receiving his seizure medication as directed, that some doses were being withheld, that he had not received the last two (2) doses and that there had been no verification that Mr. Suarez had been moved to a lower bunk.

29.     Counsel also enclosed with this correspondence, grievances completed on behalf of Mr. Suarez as he reported that the facility was refusing to give him grievance forms and otherwise preventing and inhibiting his ability to do grievances. .

30.     On July 12, 2019, Counsel again sent grievances regarding Mr. Suarez not having his medication administered correctly and requesting copies of any and all responses to the grievances being filed.

31.     Mr. Suarez had another seizure on or about August 5, 2019.

32.     After still receiving no response to either the grievances or the correspondence, on August 14, 2019, counsel sent a letter to Warden Santistevan advising that Lea County Correctional Facility was being deliberately indifferent to Mr. Suarez's serious medical condition, putting him at increased risk.   Correction of the care being given to Mr. Suarez was requested, as well as responses to the multiple grievances and correspondence sent.   Again, there was no response.

33.     On September 13, 2019, counsel wrote to John Gay, the Director of the Adult Prisons Division for NMCD, outlining the continuing indifference to Mr. Suarez's condition and attaching copies of the letters previously sent to the warden.

34.     Director Gay requested that an investigation be conducted.

35.     Mr. Suarez stated that the Warden and the Grievance Counselor pulled him out of his cell and took in to a room with no cameras.   They spent some time trying to talk him out of pursuing his grievances and told him the papers were all done wrong and that his attorney cannot send letters on his behalf.   He was also told that any lawsuit he filed would be dismissed because he didn't exhaust his administrative remedies pursuant to PLRA, while they were the ones preventing him from completing the grievance process.   In fact, Defendant Santistevan told Mr. Suarez to not file any more grievances.

36.     Upon receipt of the memo documenting the information gathered, Director Gay forwarded the results to counsel who then forwarded it to Mr. Suarez.

37.     On October 3, 2019, after speaking with Mr. Suarez, counsel again wrote to Director Gay advising that the information provided was incorrect and that Mr. Suarez disputed the accounts given.

38.     Defendant Martinez was interviewed on September 13, 2019.   He stated that Mr. Suarez's complaints of not receiving medication was not accurate while at the same time admitting that Mr. Suarez did not received his medication on April 27 and April 28, 2019.   He further stated that those doses were not received because Mr. Suarez failed to report to medication line.   Mr. Suarez disputes this account.

39.     Defendant Martinez also stated that there were no medication orders that Mr. Suarez had to receive his medication at a certain time and that his dosages were appropriate. This again is false.   The original orders for Mr. Suarez's Kepra were for 1,000 mg. twice daily. He was not receiving that.   The claim that the dosages were appropriate is contradicted by the fact that Mr. Suarez was still experiencing seizures.

40.     Brittney Buckelew, Chief of Security, was also interviewed on September 13, 2019.   She verified that Mr. Suarez was supposed to be on a lower bunk, that he would remain there based on his Health Summary Information, and that they would follow-up every 30, 60 and 90 days. Within months, he was again placed on a top bunk.

41.     The memo went on to blame Mr. Suarez's problem with the process on his "challenge with reading, writing and comprehending policies and procedures" rather than the facility's and staff's failure to properly adhere to those policies and procedures.

42.     To the contrary, Mr. Suarez was still not being given the appropriate dosage of his seizure medication, and disputed the statement that his grievances had been properly considered and resolved.

43.     On October 7, 2019, Mr. Suarez's family advised that, Mr. Suarez had yet another seizure on October 6, 2019, after which he was handcuffed and carried resulting in injuries to his wrist.

44.     On October 8, 2019, Director Gay was again contacted and it was requested that he take whatever action necessary to resolve the medication issue and prevent further seizures which can cause irreversible brain damage.

45.     Mr. Suarez repeatedly requested medical treatment and X-rays in order to determine the severity of his injuries.   Additionally at that time, Mr. Suarez filed a grievance about his meals as he was being given food that had mayonnaise on it, in spite of his well-documented allergy.

46.     On November 20, 2019, counsel again wrote to Warden Santistevan, requesting that Mr. Suarez be given adequate care for his medical conditions and receive meals pursuant to his dietary restrictions.

47.     Upon information and belief, Plaintiff never received the aforementioned medical care.

48.     Mr. Suarez was released from custody on April 15, 2020.

## COUNT ONE: NEGLIGENCE OF DEFENDANT MEDICAL PROVIDERS

49.     Plaintiff incorporates and adopts by reference all the facts and allegations contained in this Complaint for purposes of this claim.

50.     Defendants Martinez, Doctors Doe 1-3, Nurses Doe 1-3, and Centurion (hereinafter "Defendant Medical Providers") held themselves out as qualified medical providers, and undertook to care for the inmates, including Plaintiff.   Defendant Medical Providers were under a duty to possess and apply the knowledge and to use the skill and care ordinarily used by reasonably well-

qualified medical providers practicing under similar circumstances, giving due consideration to the locality involved.

51.     Defendant Medical Providers were negligent in the care, management, and treatment of Plaintiff.

52.     Defendant Medical Providers failed to apply the knowledge, skill, and care ordinarily used by reasonably well-qualified physicians and nurses practicing under similar circumstances.

53.     Such acts or omissions include, but are not limited to: negligence in the care, management, and treatment of Plaintiff; failing to recognize, treat, and evaluate Plaintiff's emergency condition in direct contradiction to their duties as medical providers; disregarding Plaintiff's emergency condition in direct contradiction to their duties as medical providers; disregarding the already prescribed treatment which was ordered by Plaintiff's doctors; and any other manner revealed in discovery.

54.     Defendant Medical Providers' negligent care, management, and treatment of Plaintiff caused Plaintiff's damages.

55.     Defendants and Centurion are liable for the acts of their contractors and employees, including but not limited to Defendant Medical Providers.

## COUNT TWO:   EIGHTH AMENDMENT PURSUANT TO 42 U.S.C. SECTION 1983 VIOLATION - CRUEL AND UNUSUAL PUNISHMENT (ALL NAMED DEFENDANTS)

56.     Plaintiff hereby incorporates by reference the allegations of the previous paragraphs as though fully set forth herein.

57.     The constitutional protection against cruel and unusual punishment for people who have been convicted of crimes applies through the Eighth Amendment and applies to the states via the Fourteenth Amendment.

58.     At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

59.     Defendants are persons under 42 U.S.C. § 1983.

60.     Defendants had a custom, policy, or practice of acting knowingly and with deliberate inference in denying obviously necessary medications, medical services, and hospitalizations to inmates at LCCF, including Plaintiff.

61.     Defendants all knew of Plaintiff's serious medical condition.   Nonetheless, with deliberate indifference to Plaintiff's Eighth Amendment constitutional right to be free of cruel and unusual punishment, these Defendants made no effort to obtain adequate and timely medical treatment for Plaintiff in order to prevent him from having seizures and injuries associated therewith.

62.     Defendants' acts or omissions include, but are not limited to: negligence in the care, management, and treatment of Plaintiff; disregarding Plaintiff's emergency condition in direct contradiction to their duties; disregarding the already prescribed treatment which was ordered by Plaintiff's doctors; and any other manner revealed in discovery.

63.     Plaintiff who had a known disability, was denied the benefits of services, programs, and activities of Defendants including but not limited to the benefits of: having a bottom bunk, proper medical care for his well-documented seizure disorder his need for medication to be administered as prescribed, encounters with correction officers, medical staff, and other staff/employees properly trained to deal with inmates with serious life threatening and

10

life altering medical conditions; being treated with dignity by the government entity sworn to protect its citizens; and being given proper accommodation given his disability in the course and duration of the correction officers, medical staff, and other staff/employees encounters with Plaintiff.

64.     Defendants herein failed to make reasonable accommodations to ensure the safe treatment and transportation of a mentally disabled individual suffering from qualifying disabilities.

65.     Defendants not only ignored the obviously serious medical needs of Plaintiff but also placed him at risk of substantial physical harm and death.

66.     Defendants exercised deliberate indifference when they failed to provide attention to Plaintiff's serious medical needs but also by intentionally interfering with the treatment that was already prescribed by him medical professionals as aforementioned.

67.     Defendant GEO/LCCF were responsible for operating a jail that protects inmates from known dangers to inmates including but not limited to those with chronic medical conditions.

68.     Defendant GEO/LCCF had a policy, practice, and custom of failing to enforce their policies, including requiring bottom bunks for inmates such as Plaintiff who had a chronic medical condition, getting inmates their medications in the proper doses and times, and getting proper medical attention for inmates who have suffered a medical episode or injury.

69.     Upon information and belief, Defendant GEO/LCCF also has a policy, practice, and custom of failing to train staff on their policies which caused dangerous conditions within LCCF.

70.     Defendant GEO/LCCF had a policy, practice, and custom of failing to ensure that there was adequate staffing to ensure inmates get their medications in the proper doses and times, and get proper medical attention for inmates who have suffered a medical episode or injury.

71.     Defendant GEO/LCCF's policies, practices, and customs, and lack of sufficient policies, procedures and training caused unreasonably dangerous conditions of medical consequence to Mr. Suarez and constitute deliberate indifference to the inmates' health and life.

72.     Upon information and belief, Defendant GEO/LCCF failed to adequately supervise their employees causing unreasonably dangerous conditions of medical consequence to Mr. Suarez and constitute deliberate indifference to the inmates' health and life.

73.     Upon information and belief, Defendant GEO/LCCF hired and promoted employees who were not qualified to perform their jobs causing unreasonably dangerous conditions in the jail and to Mr. Suarez and constitute deliberate indifference to the inmates' health and life

74.     Upon information and belief, Defendant GEO/LCCF retained employees who were not qualified to perform their jobs causing unreasonably dangerous conditions in the jail and to Mr. Suarez and constitute deliberate indifference to the inmates' health and life.

75.     The acts and omissions of Defendants were within the scope of their official duties and employment.

76.     The acts and omissions of Defendants were the legal and proximate cause of Plaintiff's damages.

77.     Defendants, both on their own and through their physicians, nurses, other health center staff, and administrators, had an official policy, custom, or practice that was deliberately indifferent to Plaintiff's Eighth Amendment rights.

12

78.     Defendants' unconstitutional policies, customs or practices were the legal and proximate cause of Plaintiff's damages.

79.     The acts and omissions of each Defendant caused Plaintiff's damages.

80.     Through the acts and omissions described herein, Defendants intentionally deprived Plaintiff of the securities, rights, privileges, liberties, and immunities guaranteed by the United States Constitution, and caused his damages.

## COUNT THREE: NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION (THE GEO GROUP, INC./LCCF, CENTURION, WARDEN DWAYNE SANTISTEVAN)

81.     Plaintiff hereby incorporates by reference the allegations of the previous paragraphs as though fully set forth herein.

82.     Defendants were negligent in the hiring, training, supervision, and retention of employees Defendants Shane Martinez, Ph.D., Doctors Does 1-3, Nurses Does 1-3, and Defendant Brittney Buckelew who, among other acts and omissions, failed to render aid to Plaintiff.

83.     Defendants' negligence includes all things stated herein but not limited to:

a.      Inadequate screening, including inadequate mental health screening Defendants Shane Martinez, Ph.D., Doctors Does 1-3, Nurses Does 1-3, and Defendant Brittney Buckelew who failed to render aid to Plaintiff and interfered with already prescribed treatment that was medically necessary and ordered by his medical providers.

b.      The aforementioned Defendants also failed to ensure that Plaintiff got the medical care that he needed.

c.      The aforementioned Defendants also failed to ensure that Plaintiff was afforded a top bunk due to his seizure disorder and which had already been approved and ordered for

13

Plaintiff.

d.      Inadequate "fit for duty" evaluations for Defendants Shane Martinez, Ph.D.,

Doctors Does 1-3, Nurses Does 1-3, and Defendant Brittney Buckelew   as prospective employees

and failure to perform adequate employee performance evaluations; and

e.      Inadequate management, training, and enforcement of policies regarding

responding to inmates with medical issues and ensuring they receive adequate responses and

consideration of those needs.

84.      As a proximate result of Defendants' negligence in hiring, training, screening,

supervision, and retention of employees such as these Defendants, Plaintiff has suffered damages.

85.      Defendants' conduct was willful, wanton, malicious, and in utter disregard and

deliberate indifference for Plaintiff's legal rights, warranting imposition of punitive damages.

## COUNT FOUR: STATE LAW CLAIM FOR NEGLIGENT MEDICAL CARE AND TREATMENT (ALL DEFENDANTS)

86.      Plaintiff incorporates all other paragraphs of this Complaint for purposes of this

claim.

87.      All named Defendants herein had a duty to provide reasonable medical care and

treatment to inmates at LCCF, including Plaintiff.

88.      All named Defendants breached their duty of care and were negligent when they

failed to provide Plaintiff with reasonably obtainable and necessary medical treatment and

interfered with already ordered and prescribed treatment. They also failed to get Plaintiff the

medical care and treatment he needed after his injuries were sustained from the seizures. They

also failed to ensure that Plaintiff was placed in a top bunk given his seizure disorder.

89.     Defendants were at all times relevant hereto were employees of Defendant The GEO Group, Inc./LCCF, or Centurion.

90.     Defendants acted on their own behalf and on behalf of Defendant The GEO Group, Inc./LCCF, or Centurion when they committed the acts giving rise to the claims against them contained in this Complaint and which may later be learned of through discovery.

91.     Defendants The GEO Group, Inc./LCCF, or Centurion are liable to Plaintiff for any harm caused by employees acting on their behalf.

92.     Because Defendants acted not only on their behalf, but also on behalf of Defendants The GEO Group, Inc./LCCF, or Centurion when they committed wrongful acts against Plaintiff, Defendants The GEO Group, Inc./LCCF, or Centurion are liable to Plaintiff for the harm caused by those acts or omissions.

93.     Defendants' negligence proximately caused Plaintiff's damages.

**WHEREFORE,** Plaintiff prays for the following relief:

a.     For compensatory damages;

b.     For hedonic damages;

c.     For punitive damages in an amount sufficient to deter the type of malicious conduct complained of herein against all named Defendants;

d.     For attorneys' fees and costs; and

e.      For pre-and post-judgment interest.

Respectfully Submitted by:

LAW OFFICE OF FRANCES CROCKETT, LLC

*/s/ Frances C. Carpenter*
Frances C. Carpenter
925 Luna Circle NW

15

Albuquerque, NM 87102
Office: 505.314.8884
frances@francescrockettlaw.com